IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>JERRY BRANDON PEARCE, )<br>)<br>Defendant. ) | Case No. 24-CR-150-RAW |

## MR. PEARCE'S OPPOSED MOTION TO DISMISS
## COUNT 1 OF THE INDICTMENT

Mr. Pearce comes before this Court and respectfully submits this Motion to Dismiss Count 1 the Indictment. (Dkt. No. 2). The Government opposes this Motion.

### LEGAL STANDARD FOR MOTIONS TO DISMISS

Federal Rule of Criminal Procedure 12(b)(1) allows a defendant to "raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." In deciding the motion, the Court should take the allegations of the indictment as true. *United States v. Mobley*, 971 F.3d 1187, 1195 (10th Cir. 2020) (quoting *United States v. Ambort*, 405 F.3d 1109, 1116 (10th Cir. 2005)). The balance of this Motion thus assumes that the allegations in the Indictment are true. "Where a defendant challenges the sufficiency of an indictment for failure to state an offense, a court generally is bound by the factual allegations contained within the four corners of the indictment." *United States v. Welch*, 327 F.3d 1081, 1090 (10th Cir. 2003).

### ANALYSIS

This Motion to Dismiss challenges the constitutionality, on its face and as applied to Mr. Pearce, of 18 U.S.C. § 922(g)(1), which prohibits "any person who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year" from possessing any firearm

or ammunition that has been shipped or transported in interstate or foreign commerce. The distinction between facial and as-applied challenges "goes to the breadth of the remedy employed by the Court." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010). "[I]t does not speak at all to the substantive rule of law necessary to establish a constitutional violation," and therefore the same substantive constitutional analysis applies. *Bucklew v. Precythe*, 139 S. Ct. 1112, 1127 (2019).

The Indictment charges Mr. Pearce with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). (Dkt. No. 2). It alleges that he was previously convicted of a crime punishable by more than one year imprisonment but does not state what the prior conviction is. (*Id.*). Mr. Pearce asserts that this Indictment is defective under Federal Rule of Criminal Procedure 12(b)(3)(B)(v) for failure to state an offense because 18 U.S.C. § 922(g)(1) is unconstitutional on its face and as applied to him. Mr. Pearce has pled not guilty to the charges in the Indictment.

The United States Supreme Court has vacated the Tenth Circuit's decision in *Vincent v. Garland*, 80 F.4th 1197 (10th Cir. 2023), for consideration in light of the Supreme Court's decision in *United States v. Rahimi*, 602 U.S. ---, 144 S. Ct. 1889 (2024). *See Vincent v. Garland*, SCOTUS Case No.23-683, Order Granting Petition for Certiorari (July 2, 2024). Thus, *Vincent* no longer binds this Court in its analysis of motions filed seeking relief under *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). Any Tenth Circuit case relying upon *Vincent*, rather than applying a full *Bruen* analysis, is equally infirm in its binding authority over this Court. The Tenth Circuit has received some briefing; Appellee's supplemental brief is currently due on October 24, 2024.

I. The *Bruen* Test

"A well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *Bruen* the Supreme Court gave direction on how courts should examine challenges to statutes on the grounds that they violate the Second Amendment. In doing so, it set forth its own two-part test:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id.* at 2129–30. With respect to the second step—consistency with historical tradition—the *Bruen* Court suggested that courts should consider "whether 'historical precedent' from before, during, and even after the founding evinces a comparable tradition of regulation." *Id.* at 2131–32. However, the Supreme Court made it clear that the burden of producing this historical precedent lay with the government, not with the defendant or even the courts; it even discouraged courts from "sift[ing] the historical materials for evidence to sustain" the regulation because "[t]hat is the [government's] burden." *Id.* at 2150.

The second step of *Bruen*'s test is likely to require analogical reasoning: "[D]etermining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar.'" *Id.* at 2132 (quoting C. Sunstein, On Analogical Reasoning, 106 Harv. L. Rev. 741, 773 (1993)). While the Government need not identify "historical twin[s]," it must at least provide "well-established and representative historical analogue[s]." *Id.* at 2133. Two key metrics are "how and why the regulations burden a law-abiding citizen's right to armed self-defense," because the right to self-defense is "the central component" of the right conferred by the Second Amendment. *Id.* at 2133

(quoting *McDonald*, 561 U.S. at 767)). Thus, the central consideration is "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* This approach should be seen as neither a straitjacket nor a blank check; mere resemblance to a historical analogue is not sufficient, but neither is it necessary that the modern law be a dead ringer for historical analogues. *Id.*

In *United States v. Rahimi*, the Supreme Court elaborated on this test and explained that "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." 144 S. Ct. at 1898. "Why and how the regulation burdens the right are central to this inquiry." *Id.* Where laws at the founding were designed to address a specific problem, that serves as "a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations." *Id.* On the other hand, even where a law might regulate firearms for permissible reasons, "it may not be compatible with the right if it does so to an extent beyond what was done at the founding." *Id.*

## II.   Mr. Pearce is among "the people" who have rights under the Second Amendment.

As a threshold matter, when a defendant challenges the constitutionality of a firearm restriction under the Second Amendment, courts sometimes ask whether a criminal defendant is among "the people" to which the Second Amendment's protections apply.[1] Before delving too

---

[1] It is debatable whether this question should appropriately be asked separately from *Bruen*'s two-step inquiry. It would seemingly create a "step zero" to the *Bruen* analysis—much like some view *Chevron* deference as possessing a "step zero." *See, e.g.*, *N. N.M. Stockman's Ass'n v. U.S. Fish & Wildlife Serv.*, 494 F. Supp. 3d 850, 980 n.27 (D.N.M. 2020); Cass R. Sunstein, Chevron Step Zero, 92 Va. L. Rev. 187, 191–92 (2006). The Second Amendment's protections should apply, at a minimum, to all Americans. The question of whether a defendant's protections may be stripped due to some extraneous status is not properly resolved at an amorphous "step zero," but instead at step two of the *Bruen* analysis, where the Government bears the burden to prove that the applicable prohibition is supported by the tradition and history of the United States.

deeply into this topic, Mr. Pearce notes that the Supreme Court, in deciding *Rahimi*, never once questioned whether Zackey Rahimi was among "the people," and made no mention of *Heller*'s oft-cited statement about "law-abiding, responsible citizens." *See Rahimi*, 144 S. Ct. 1889; *Heller*, 554 U.S. at 635. Thus, there is at least some reason to believe that this question is not independent of the *Bruen* test, but that it is instead part of the *Bruen* test and addressed at step two. Even so, Mr. Pearce addresses why he is among "the people" who has Second Amendment rights.

In *Heller*, the Supreme Court explicitly defined "the people" to whom the Second Amendment's protections extend. 554 U.S. at 580. First, it pointedly recognized that "in all six other provisions of the Constitution that mention 'the people,' the term unambiguously refers to all members of the political community, not an unspecified subset." *Id.* It followed by looking to its own prior precedent that "the people" is a term of art "refer[ring] to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Id.* (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)). The *Heller* Court therefore started "with the strong presumption that the Second Amendment right is exercised individually and belongs to all Americans," *id.* at 581, and it confirmed that presumption through further analysis, *id.* at 595. In other words, the Supreme Court views it as inappropriate to limit the scope of the Second Amendment's reach to "subsets" of persons.

Although this decision has since been reversed, the Fifth Circuit in *Rahimi* recognized the ongoing debate about how the term "law-abiding" citizen should impact this analysis. *United States v. Rahimi*, 61 F.4th 443, 451–52 (5th Cir. 2023), *reversed following grant of certiorari by United States v. Rahimi*, 144 S. Ct. 1889. It noted that two schools of thought come into play. The first "uses history and tradition to identify the scope of the right" granted by the Second

Amendment, while the second "uses that same body of evidence to identify the scope of the legislature's power to take" away that right. *Id.* (quoting *Kanter v. Barr*, 919 F.3d at 452 (Barrett, J., dissenting)). The Fifth Circuit adopted the second approach in light of *Heller*'s emphasis that the Second Amendment grants its right to "all Americans," and *Bruen*'s emphasis on the historical limitations set by legislatures. *Id.* at 452.

Judge Wyrick, in the Western District of Oklahoma, also focused on *Heller*'s pronouncement in response to the United States' argument that the Second Amendment's protections did not apply to "lawbreakers" like marijuana users. *United States v. Harrison*, 654 F. Supp. 3d 1191, 1197–98 (W.D. Okla. 2023). He noted that this was "precisely the sort of carving out of a subset from 'all Americans' that the *Heller* Court rejected." *Id.* Moreover, he pointed out that an approach of this nature shifts the United States' historical tradition burden back to the defendant and requires them to first overcome it before ever reaching the *Bruen* analysis. *Id.*

The Court held in *United States v. Forbis*, that a felon is among "the people" who possess Second Amendment rights. 687 F.Supp.3d 1170, 1175 (N.D. Okla. 2023) (citing *United States v. Coombs*, 629 F. Supp. 3d 1149, 1156 (N.D. Okla. 2022)), *vacated* by Case No. 23-CR-133-GKF Dkt. No. 44 (holding that, in light of the decision in *Vincent*, the order dismissing the indictment must be vacated).

Judge Russell, in *United States v. Gaskey*, did not address whether felons are among "the people," but he also gave no indication that he would have found them to be otherwise. *See* --- F. Supp. 3d ---, 2024 WL 1624846, at *2–3. Instead, Judge Russell noted that he was bound by the Tenth Circuit's ruling in *Vincent* and pointed out:

> If this Court had a blank slate on which to write this Opinion, it would, by necessity, follow the Bruen analysis and consider whether the mere possession of a handgun and ammunition is protected Second Amendment activity (it is) and whether, in this case, the Government has demonstrated that the restriction set forth in § 922(g)(1)

6

is "consistent with the Nation's historical tradition of firearm regulation" (it has not).

*Id.* at *3.

This Court should hold the Government to that burden now that *Vincent* is vacated. Even though Mr. Pearce is alleged to have a prior felony conviction, this Court should find that he is among "the people" who possess rights granted by the Second Amendment.

### III. The Second Amendment's plain text covers the possession of firearms and ammunition.

Under *Bruen*, the first question a court must resolve is whether "the Second Amendment's plain text covers an individual's conduct." 142 S. Ct. at 2129–30. If it does, "the Constitution presumptively protects that conduct." *Id.* Since Mr. Pearce challenges the constitutionality of Section 922(g)(1), the question must be whether the conduct prohibited by Section 922(g)(1) is covered by the Second Amendment's plain text. *Id.*

Section 922(g)(1) straightforwardly states: "It shall be unlawful for any person who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year to . . . possess in or affecting commerce, any firearm or ammunition." At this stage of the *Bruen* analysis, Mr. Pearce's status is irrelevant; it is his conduct that matters. *See, e.g.*, *United States v. Bullock*, 679 F. Supp. 3d 501, 526 & 534 (S.D. Miss. 2023) (holding that defendant's possession of an ordinary firearm was covered by plain text of Second Amendment regardless of defendant's status as a felon).

The Second Amendment states, "A well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Supreme Court explained in *Heller* that the most natural reading of the right to "keep arms," "is to 'have weapons.'" 554 U.S. at 582. Accordingly, "the Second Amendment

extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.*

*Bruen*'s first step does no more than ask whether this conduct falls within the plain text of the Second Amendment. The conduct is possession of a particular weapon and its ammunition. Given that the charged firearm is a bearable arm and possession of a bearable arm falls within the meaning of "keep[ing] arms," *Heller*, 554 U.S. at 582, possession of the charged weapon and its ammunition is within the plain text of the Second Amendment. Beyond asking whether it is a bearable arm, the first step does not contemplate the nature of the firearm or the status of the individual.

### IV. The Government now bears the burden of justifying Section 922(g)(1)'s prohibition by establishing that it is consistent with this Nation's historical tradition of firearm regulation.

Because the Second Amendment's plain text covers Mr. Pearce's conduct, "the Constitution presumptively protects that conduct." 142 S. Ct. at 2129–30. The burden now shifts to the Government to justify the regulation in Section 922(g)(1) "by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130. Put simply, the Government "must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127. The Supreme Court explained that the Government can meet its burden by providing "historical precedent from before, during, and even after the founding evinces a comparable tradition of regulation." *Id.* at 2131–32 (internal quotation marks omitted). And it further noted that courts "are not obliged to sift the historical materials for evidence to sustain" the regulation because that is the Government's burden. *Id.* at 2150.

While the Government need not identify "historical twin[s]," it must at least provide "well-established and representative historical analogue[s]." *Id.* at 2133. *Bruen* sets forth a useful metric to understand whether an analogue adequately supports the government's contention: "[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are central considerations when engaging in an analogical inquiry." *Id.* at 2133 (internal quotation marks and emphasis omitted). This approach should be seen as neither a straitjacket nor a blank check; mere resemblance to a historical analogue is not sufficient, but neither is it necessary that the modern law be a dead ringer for historical analogues. *Id.*

Mr. Pearce does not here raise any historical arguments of his own. It is not his burden to disprove the existence of historical analogues. Should the Government attempt to carry its burden, Mr. Pearce will address its arguments and purported analogues.

However, Mr. Pearce does raise one point in support of his own position. Then-Judge Barrett, as well as Judge Wyrick of the Western District of Oklahoma and Judge Frizzell of the Northern District of Oklahoma, have each concluded that this Nation's historical tradition of firearms regulation, insofar as it touches upon prior criminal conduct as a basis for regulation, "does not support disarming a person merely because they have engaged in felonious conduct, it does support a different proposition: 'that the legislature may disarm those who have demonstrated a proclivity for violence' through past violent, forceful, or threatening conduct (or past attempts at such conduct)." *United States v. Harrison*, 654 F. Supp. 3d 1191, 1210 (W.D. Okla. 2023); *Kanter*, 919 F.3d at 454 (Barrett, J., dissenting) ("As I explain below, none of these rationales supports the proposition that the legislature can permanently deprive felons of the right to possess arms simply because of their status as felons. The historical evidence does, however, support a different

9

proposition: that the legislature may disarm those who have demonstrated a proclivity for violence or whose possession of guns would otherwise threaten the public safety."); *Forbis*, 687 F. Supp. 3d at 1178 (quoting *Harrison*, 654 F. Supp. 3d at 1210). "[T]o put it another way, "the historical record" demonstrates "that the public understanding of the scope of the Second Amendment was tethered to the principle that the Constitution permitted the dispossession of persons who demonstrated that they would present a danger to the public *if armed*." *Harrison*, F. Supp. 3d at 1210 (emphasis added). The key point here being that merely having committed some prior felony is not a basis to permanently disarm someone who has not otherwise demonstrated a danger to society if they are armed. Therefore, this Court should hold that there is no historical tradition supporting the permanent, perpetual disarmament of persons who have been alleged to have committed crimes like Mr. Pearce.

### V. *Vincent* misapplied the precedent upon which it relied, failed to faithfully apply the Supreme Court's ruling in *Bruen*, and created an unnecessary circuit split.

In *Vincent*, the Tenth Circuit declined to give effect to the watershed constitutional test that the Supreme Court set forth in *Bruen*. 80 F.4th at 1201–04. It reasoned that it was not obligated to do so because *Bruen* did not "indisputably and pellucidly abrogate[]" its decision in *United States v. McCane*, 573 F.3d 1037, 1047 (10th Cir. 2009). *Vincent*, 80 F.4th at 1202. Its support for that proposition lay with its holding in *Barnes v. United States*, 776 F.3d 1134, 1147–48 (10th Cir. 2015), which declined to overrule prior precedent concerning the jurisdictional nature of a statute of limitations even following the Supreme Court setting forth new standards for how to determine if a statute of limitations was jurisdictional. *Vincent*, 80 F.4th at 1200–01. While the *Barnes* panel held that it need not apply the new test, it also concluded that the claimants would not have been entitled to relief even if they prevailed under the new test. While *Barnes* did not explicitly state

that this was a necessary component of its holding, the notion that application of the new test would not change the outcome likely played some role in the decision to not apply it.

*Vincent* did not even go that far. It did not contemplate the possibility of a different outcome under the *Bruen* test. It is one thing to decline to apply the new test where doing so would be futile. It is another thing entirely to refuse to apply a test that could result in a different outcome and could have extraordinary consequences for millions of individuals throughout the Circuit. The decision in *Vincent* impacted not only the ability of individuals to exercise their constitutional rights, but also whether they face the loss of their freedom for exercising that right.

Moreover, the *Vincent* panel's failure to give effect to the Supreme Court's decision in *Bruen* was simply wrong. The *Vincent* panel claimed that *McCane* was not pellucidly overruled because it did not apply the test that the *Bruen* Court explicitly rejected. 80 F.4th at 1201–02. But *McCane* did not apply any test at all; it simply cited the dicta in *Heller* and declined to consider the matter any further. 573 F.3d at 1047. Indeed, *McCane* disposed of the constitutional question in a mere two sentences. *Id.* These two sentences apparently stand resolute against a watershed test established by the Supreme Court in *Bruen* to evaluate the constitutionality of firearms regulations. Even assuming it was appropriate to give effect to *Heller*'s dicta in *McCane*, that dicta can hold no weight in the face of an explicit test set forth by the highest court in the land.

The Ninth Circuit, in holding Section 922(g)(1) unconstitutional, contemplated whether mere recitation of *Heller*'s dicta would be sufficient to preclude application of the *Bruen* test to Section 922(g)(1). *United States v. Duarte*, 101 F.4th 657, 668 (9th Cir. 2024), *vacated upon grant of rehearing en banc by* --- F.4th ---, 2024 WL 3443151 (9th Cir. 2024).[2] "Simply repeating

---

[2] While the *Duarte* opinion has been vacated, its discussion of the applicability of *Heller*'s dicta as a method of completely bypassing the *Bruen* analysis remains persuasive.

Heller's language about the presumptive lawfulness of felon firearm bans will no longer do after *Bruen*." *Id.* (internal quotation marks and brackets omitted). This is because "*Bruen* expressly requires courts to assess whether § 922(g)(1), like any regulation infringing on Second Amendment rights, is consistent with this nation's historical tradition of firearm regulation." *Id.* (internal quotation marks, brackets, and citations omitted). The Ninth Circuit believed that such an approach would do nothing more than "pay lip service to this mandate if we continued to defer . . . to *Heller's* footnote, not least because the historical pedigree of felon firearm bans was never an issue the *Heller* Court purported to resolve." *Id.*

The *Vincent* panel's failure to give effect to *Bruen* created a then-existing circuit split not only with the Third Circuit, but also with the Eighth Circuit, both of which ruled on the merits of the constitutionality of 922(g)(1) instead of holding that prior precedent precluded any challenge. *United States v. Jackson*, 69 F.4th 495, 501–06 (8th Cir. 2023), *vacated following grant of certiorari by* --- S. Ct. ---, 2024 WL 3259675 (2024); *Range v. Attorney General*, 69 F.4th 96, 106 (3d Cir. 2023), *vacated by* --- S. Ct. ---, 2024 WL 3259661 (2024). This split was not based on a difference of opinion as to the merits of a *Bruen* challenge; it was based on the decision to give preclusive effect to a twelve-year-old case that disposed of an important constitutional question with only two sentences and no analysis.

*Vincent* was not merely wrong, it failed to apply the Supreme Court's clear and unambiguous ruling. Where application of the Supreme Court's watershed test is capable of changing the outcome of a question concerning not only constitutional rights, but also the freedom of every person within the Tenth Circuit, that test should be applied faithfully. The Tenth Circuit did not do that in *Vincent*. Therefore, this Court should reject *Vincent*'s approach and apply *Bruen* faithfully.

## CONCLUSION

WHEREFORE, Mr. Pearce respectfully requests this Court grant his Motion to Dismiss Indictment.

Respectfully submitted,

OFFICE OF THE FEDERAL PUBLIC DEFENDER
Scott A. Graham, Federal Public Defender

By: *Gabrielle Kolencik*
Gabrielle Kolencik
PA Bar No. 331808
Assistant Federal Public Defender
Office of Federal Public Defender
One West Third St., Ste. 1225
Tulsa, Oklahoma 74103
(918) 581-7656
Gabrielle_kolencik@fd.org
Counsel for Mr. Jerry Brandon Pearce

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 22, 2024, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmitted a Notice of Electronic Filing to the following ECF registrants:

Richard Lorenz
Assistant United States Attorney